## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Case No.: 23-cr-00266-BAH** |
|  | : |  |
| v. | : | **18 U.S.C. § 111(a)** |
|  | : |  |
| TYLER BRADLEY DYKES, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

**FILED**

APR 1 9 2024

Clerk, U.S. District and
Bankruptcy Courts

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Tyler Bradley Dykes, with the concurrence of the defendant's attorneys, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2.      On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public. The grounds around the Capitol were posted and cordoned off, and the entire area as well as the Capitol building itself were restricted as that term is used in Title 18, United States Code, Section 1752 due to the fact that the Vice President and the immediate family of the Vice President, among others, would be visiting the Capitol complex that day.

3.      On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. This joint session of Congress was an official proceeding as that term is used in Title 18, United States Code, Section 1512. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building

and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

*Dykes's Telegram Chat Group Affiliations in/around January 6, 2021*

8.    Leading up to January 6, 2021, Tyler Bradley Dykes subscribed to several public Telegram groups that discussed the 2020 Presidential election, alleged voter fraud, the Electoral College Certification, and anticipated events related to the certification that were going to take place on January 6, 2021 in Washington, D.C. One such Telegramgroup appeared to be associated with then-President Trump, while another Telegram group appeared to be called "Britan First Party – Britain First – Taking Our Country Back."

9.    Shortly before, during, and after January 6, 2021, a third Telegram group to which Dykes subscribed called for violence and government overthrow by force, including in the following messages:[1]

- December 30, 2020:
  - "Remember, the government is not bound to you in any way. Nobody voted anybody into office because they wanted Pakistani Gender Programs. Accountablity [sic] comes from violence and force."
- December 31, 2020:
  - "My U-Battle Rifle A 3D Printable DPMS Style AR-10 Lower."
- January 5, 2021:
  - "'In the life of nations, what in the last resort decides questions is a kind of Judgment Court of God. It may even happen that in case of a dispute between two peoples - both may be in the right... Who yields voluntarily? No one! So the strength which each people possesses decides the day. ALWAYS BEFORE GOD AND THE WORLD THE STRONGER HAS THE RIGHT TO CARRY THROUGH WHAT HE WILLS."
    - Adolf Hitler
    (April 13th, 1923)'"
- January 6, 2021:
  - "The Whiteman doesn't riot often, but when he does it echoes the world over[.]"
  - "Fuck peace. The time for peace has passed. Hail holy terror. Hail chaos. The sooner the average retard loses faith in this corrupt government, the sooner we can rebuild properly."

---

[1] Dykes did not personally send any of these messages.  Rather, they were posted by others on the Telegram groups to which he subscribed.

- January 7, 2021:
  - "Today's events again prove what everyone with the least amount of knowledge perceives:
    — The only language that corrupted systems and systems understand and fear is Direct Action.
    Violence in its naked, raw and pure form.
    Look at international reactions.
    — See how every single one of Europe's leading leaders fear that today's events will provoke a wave of National-Populist rebellions to happen in their respective countries.
    May this, finally, be the beginning of a wave of Konservative Revolutions in the so-called Western World."

### Dykes's Participation in the January 6, 2021 Capitol Riot on the Capitol's East Front

10.     Around January 6, 2021, the defendant, Dykes, lived in Bluffton, South Carolina.

11.     On the evening of January 5, 2021, Dykes traveled from South Carolina to the Washington, D.C. area, where he stayed overnight in a hotel in Virginia with two friends from South Carolina.

12.     On the morning of January 6, 2021, Dykes traveled with his friends from his hotel to the National Mall, where he attended former President Trump's rally at the Ellipse. From there, he walked with his friends from the rally towards the United States Capitol Building and grounds.

13.     As Dykes approached the Capitol, he saw and disregarded the snow fencing and bicycle rack barricades with "AREA CLOSED" signs that had been put in place by U.S. Capitol Police to demarcate where the Capitol's grounds were restricted.

14.     As he rounded the northeast corner of the grounds of the U.S. Capitol Building around 1:05 p.m., Dykes removed snow fencing stakes and attempted to move aside the snow fencing. He proceeded toward the Capitol's east plaza where he moved aside metal bicycle rack

barricades, allowing other rioters to more easily enter the restricted area, where a mob was quickly overrunning the limited number of U.S. Capitol Police officers.

15.     By approximately 2:05 p.m., after the violent mob successfully pushed the outnumbered U.S. Capitol Police officers backwards from their posts near the bicycle rack barricades on the east side, Dykes was one of the people near the front of the mob that forced officers to continue retreating backwards up the East Rotunda steps.

16.     Within minutes, hundreds of rioters had flooded and overtaken the platform area outside the East Rotunda doors. The mob had forced the small number of officers all the way backwards, and those officers had formed a small line in front of the East Rotunda doors. With their backs to the doors, the officers were attempting to prevent rioters from breaching the doors and entering the Building.

17.     By approximately 2:24 p.m., the U.S. Capitol Police deployed a flashbang-like device that emitted a loud "bang" noise and smoke, which the police hoped would disperse the violent crowd. However, this action did not deter the crowd, which included Dykes (who was about 20 rioters away from the east Rotunda doors at the time). Within the next minute, rioters already inside the Capitol began pushing the East Rotunda doors from the inside, which allowed the rioters outside the door to grab hold of and briefly open the doors. While the doors were briefly open for about two minutes, Dykes was among a group that was pushing to attempt to get nearer to the open doors and inside the Building. Dykes was also being pushed by members of the group.

18.     However, about ten minutes later, around approximately 2:35 p.m., the mob outside the doors began chanting loudly and excitedly while rioters inside continued attempting to reopen the East Rotunda doors. Dykes then pushed his way to the front of the mob, where he forcibly,

voluntarily, and intentionally grabbed hold of one U.S. Capitol Police Officer's riot shield. These shields are heavy, made of very hard plastic, and over five-feet tall.

19.     Wearing a gray puffer jacket, a gray-colored neck gaiter over his face at all times, black gloves, and a tan Adidas baseball hat, Dykes stood about a head taller than many rioters around him. After initially grabbing the U.S. Capitol Police officer's riot shield, Dykes then continued forcibly, voluntarily, and intentionally using his body and hands to pull the shield away from the officer, who was attempting to maintain control of the shield.

20.     Eventually, Dykes overcame the officer and succeeded in breaking the officer's shield free from the officer's hands, leaving the officer off balance and vulnerable. Dykes then lifted the shield over his head, turned backwards away from the doors, and reoriented himself in the tightly packed crowd. Other members of the mob deployed pepper spray in the direction of the officer from whom Dykes had stolen the shield and the small number of officers surrounding that officer, who continued attempting to protect the East Rotunda doors. Also immediately after Dykes stole the shield, the mob re-engaged with the line of officers, violently pushing them, throwing things at them, and continuing to pepper spray them, among other things.

21.     After reorienting himself and turning the riot shield around to hold it by the handles, Dykes turned back towards the East Rotunda doors and the police line. He began using the shield to forcibly push other rioters ahead of him, who pushed against the line of officers. As he did so, Dykes was among a small group of rioters who were within approximately 10 feet of the East Rotunda doors. He also used the riot shield to obstruct and intimidate the police officers defending the Capitol.

22.     By 2:39 p.m., the mob had successfully breached the East Rotunda doors for a second time, including Dykes, who entered the U.S. Capitol Building around that time, still holding the police riot shield and using it to forcibly push his way inside.

*Dykes's Participation in the January 6, 2021 Capitol Riot Inside the Capitol Building*

23.     Once inside the U.S. Capitol Building, Dykes entered the Capitol's Rotunda, where he continued carrying the stolen police riot shield. At the time he entered, the mob was chanting, "Treason, treason, treason!"

24.     Then, by approximately 2:48 p.m., Dykes joined a group of rioters in the second-floor main hallway, north of the Small Senate Rotunda. There, the rioters were confronting a line of Metropolitan Police Department ("MPD") officers that had formed to prevent the angry mob from getting closer to the Senate Floor. The group was loudly and repeatedly chanting "Whose house? Our house!" and then "You serve us!"

25.     As the mob began pushing the line of officers, a number of rioters were yelling orders to "push!" Other rioters were yelling, "Get in there, get in there! They can't hold us!" Dykes first pushed his way from the rear to the front of the group of rioters. Then, still using the same riot shield he stole from the U.S. Capitol Police Officer outside the Building, Dykes used the police riot shield to obtain leverage while he and others forcibly, voluntarily, and intentionally pushed the line of MPD officers backwards, resisting and opposing their attempts to stop the group from moving closer to the Senate Chamber. Dykes and other rioters successfully impeded and interfered with the police line: the officers were forced to retreat further down the hallway. As they forced the officers back, the rioters began chanting, "USA, USA, USA!" Dykes also continued holding the shield and using it to obstruct and intimidate the police officers defending that hallway.

26.     By approximately 2:53 p.m., Dykes returned to the area just inside the East Rotunda doors and exited the U.S. Capitol Building. Before exiting and as he crossed the threshold of the East Rotunda doors, Dykes was still carrying the stolen police riot shield.  Just after exiting the doors, Dykes surrendered the shield to an officer who took hold of it.

### Dykes's Participation in the January 6, 2021 Capitol Riot on the Capitol's West Front

27.     Sometime after exiting the U.S. Capitol Building, Dykes made his way to the other side of the U.S. Capitol Building, the west front. As the sky was darkening, Dykes observed thousands of violent rioters who were still occupying the inaugural stage area on the west front. Dykes did not leave restricted Capitol grounds until after additional flashbangs and tear gas were deployed by law enforcement on the west front.

### Elements of the Offense

28.     As to Count Three, the parties agree that 18 U.S.C. § 111(a)(1) requires the following elements: First, Dykes assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer from the United States Capitol Police. Second, Dykes did such acts forcibly. Third, Dykes did such acts voluntarily and intentionally. Fourth, that officer from the United States Capitol Police Department was then engaged in the performance of his official duties. Fifth, Dykes made physical contact with the officer or acted with the intent to commit another felony, that is, a civil disorder in violation of 18 U.S.C. § 231(a)(3).

29.     As to Count Four, the parties further agree that 18 U.S.C. § 111(a)(1) requires the following elements: First, Dykes assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer from the Metropolitan Police Department. Second, Dykes did such acts forcibly. Third, Dykes did such acts voluntarily and intentionally. Fourth, that officer from the Metropolitan Police Department was assisting officers of the United States who were then engaged in the

performance of their official duties. Fifth, Dykes made physical contact with the officer from the Metropolitan Police Department or acted with the intent to commit another felony, that is, a civil disorder in violation of 18 U.S.C. § 231(a)(3).

### *Defendant's Acknowledgments*

30.     As to Count Three, Dykes knowingly and voluntarily admits to all the elements as set forth above. Specifically, Dykes admits that he forcibly assaulted an officer of the United States Capitol Police Department who was engaged in the performance of his official duties, that he did so voluntarily and intentionally, and that he both made contact with that officer and acted with the intent to commit another felony, specifically, a violation of 18 U.S.C. § 231(a)(3). Dykes further agrees that he used the police riot shield in a manner consistent with United States Sentencing Guidelines §§ 1B1.1, 2A2.2(b)(2)(B).

31.     As to Count Four, Dykes knowingly and voluntarily admits to all the elements as set forth above. Specifically, Dykes admits that he forcibly resisted, opposed, impeded, intimidated, and interfered an officer from the Metropolitan Police Department who was assisting officers of the United States engaged in the performance of their official duties, that he did so voluntarily and intentionally, and that he acted with the intent to commit another felony, specifically, a violation of 18 U.S.C. § 231(a)(3). Dykes further agrees that he used the police riot shield in a manner consistent with United States Sentencing Guidelines §§ 1B1.1, 2A2.2(b)(2)(B).

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Samantha R. Miller_____
        SAMANTHA R. MILLER
        Assistant United States Attorney

New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Tyler Bradley Dykes, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4/16/24

Tyler Bradley Dykes
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4-16-2024

William F. Nettles, IV
Edmund Neyle
Attorneys for Defendant