**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Crim. No.: 1:23-cr-00266-BAH** |
| | ) | |
| **v.** | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| **TYLER BRADLEY DYKES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Defendant Tyler Bradley Dykes, through undersigned counsel, respectfully submits this memorandum concerning his upcoming sentencing hearing on July 19, 2024.

Tyler was only 22 years old when the Capitol riot occurred on January 6, 2021. Leading up to January 6, Tyler was following the nonstop media coverage surrounding the controversial and polarizing 2020 presidential election. Media reports—and then-President Trump's own Twitter feed—led him to believe the election had been "stolen" from Trump. When the President staged a rally to protest the election results, Tyler wanted to attend the rally. Thus, he traveled to Washington, D.C., where he met his friends from his church (who did not participate in the riot). On January 6, Tyler and his friends attended President Trump's rally at the Ellipse. From there, Tyler walked to the United States Capitol Building where he engaged in conduct that he will forever regret.

Tyler is a young man who made incredibly poor decisions on January 6, 2021. Next Friday, he will stand before this Court facing the stark prospect of serving

1

multiple years in federal prison, isolated from his local community and elderly, loving parents.  Tyler knows he must be punished, but a sentence within the advisory range of 51 to 63 months' imprisonment is unduly severe.  His youth, bond compliance, and specific conduct on January 6 all justify a substantially lower sentence.

When comparing Tyler's case with other January 6 cases, and when applying the other § 3553(a) sentencing factors, it is clear a lengthy prison sentence does not accomplish the true goals of federal sentencing.  Tyler respectfully asks this Court to vary downward and impose a sentence of 24 months' imprisonment.

### Legal Standard

"There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her as an individual." *Concepcion v. United States*, 597 U.S. 481, 486 (2022) (internal quotation marks omitted).  "Congress has instructed sentencing courts to impose sentences that are sufficient, but not greater than necessary, to comply with (among other things) certain basic objectives, including the need for just punishment, deterrence, protection of the public, and rehabilitation." *Holguin-Hernandez v. United States*, 140 S. Ct. 762, 765–66 (2020) (cleaned up).

A sentencing proceeding begins with a correct calculation of the applicable Sentencing Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Guidelines are only the "starting point"; they are "advisory only." *Hughes v. United States*, 584 U.S. 675, 681, 686 (2018).  A court "may not presume

that the Guidelines range is reasonable"; it "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.  A court must consider not only the Guidelines but also all other statutory sentencing factors outlined in 18 U.S.C. § 3553(a).[1]  *Chavez-Meza v. United States*, 138 S. Ct. 1959, 1963 (2018).

## Discussion

## I.   Nature and Circumstances of the Offense—and Tyler's Acceptance of Responsibility

Tyler pled guilty to two counts of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).  ECF No. 32.  He also signed a Statement of Offense admitting in detail to the actions he committed at the United States Capitol Building on January 6, 2021.  ECF No. 33.  Tyler's timely guilty plea and factual stipulation were the first steps on his long path of remorse and redemption for his involvement in the Capitol riot.

Tyler knows he cannot gloss over his actions taken on January 6.  As fully acknowledged in the Statement of Offense, Tyler admits he moved barriers, was near the front of the crowd that ascended the stairs on the east side of the Capitol Building, and took a police officer's shield.  He admits using the shield to push other

---

[1]  These factors include the circumstances of the crime; the history and characteristics of the defendant; the need for deterrence; protection of the public; provision of educational or vocational training, medical care, or other treatment; the kinds of sentence and the sentencing range established by the Sentencing Commission and Congress; the relevant policy statements of the U.S. Sentencing Commission; the need to avoid disparities among defendants with similar records and similar conduct of guilt; and the need to provide restitution to the victim.  *See* 18 U.S.C. § 3553(a).

rioters who were pushing against police officers.  He admits entering the Capitol through the East Rotunda doors holding the shield, and once inside, pushing against a police line protecting the Senate Floor, forcing the officers to retreat.  He admits he walked around the interior of the Capitol for several minutes and then exited through the East Rotunda doors where he surrendered the shield to a police officer.

Tyler knows his conduct was egregious.  At the same time, however, he did not plan that conduct before January 6.  He never devised to go to the Capitol Building and grounds.  He did not go to Washington, D.C. intending to hurt anyone or damage anything.  He went to attend a rally at the Ellipse.  But then he, like so many others attending the rally, walked towards the Capitol and became involved in the amplifying chaos.  His subsequent actions were impetuous and wrong.  While his actions were completely unjustifiable, Tyler did not engage in the degree of extreme violence that many other rioters did.  He did not punch or kick anyone, hurl projectiles, smash windows, break doors, or destroy property.

Tyler knows his actions on January 6 were illegal, indefensible, and intolerable.  He recognizes his misconduct on January 6 had serious consequences for the law enforcement officers protecting the Capitol Building, the structure's physical integrity, and the democratic process occurring that day.  His actions have also devastated those who love him most: his parents.

Tyler realizes his conduct on January 6 carried with it arrogance—an arrogance of impunity.  Tyler also realizes January 6 cannot be undone.

4

Nevertheless, with his guilty plea, Tyler seeks to confess his arrogance was wrong, and he wants to demonstrate his sincere remorse.

## II.     Tyler's History and Characteristics

Tyler's parents, Scott and Susan, adopted him at birth.  Tyler's birth mother lived with them during the last month of her pregnancy.  Tyler is old enough now to realize the sacrifices his parents made to adopt and raise him when they were otherwise already old enough to be grandparents.  Tyler has repeatedly emphasized to both his parents and defense counsel how important the "family unit" is to him. *See* Letter of Susan Dykes.

Tyler spent his early childhood in Dublin, California (near Oakland).  When his father was approaching retirement age, the family moved to the area near Charlotte, North Carolina.  Tyler spent his middle and high school years in North Carolina trying to make friends in a completely new geographic region.

Tyler was a gifted student and is a talented musician.  He can play music "by ear" as well as read music.  He played the mellophone and trumpet through his school band department.  At age sixteen, he competed for and won a coveted spot in the Spirit of Atlanta Drum and Bugle Corps.  *See* Spirit of Atlanta, https://www.spiritofatlanta.org (last visited July 5, 2024).

Tyler achieved the rank of Eagle Scout in the Boy Scouts of America also at age sixteen.  To earn the Eagle Scout badge, a Boy Scout must prepare and complete a service project that fulfills the Scout oath "To help other people at all times."  *See* Eagle Scout Service Project Handbook,

5

https://www.scouting.org/programs/scouts-bsa/advancement-and-awards/eagle-scout-workbook/ (last visited July 6, 2024).  Tyler's Eagle Scout project involved building a workbench for a food pantry.  His father supervised the project and helped Tyler and other scouts complete it.  Tyler's mother describes him as "[k]ind, caring about others, passionate, highly intelligent and hardworking."  Letter of Susan Dykes.  These are all traits of an Eagle Scout.

Tyler graduated from North Lincoln High School in Denver, North Carolina. He was a straight-A student and graduated fifth in his high school class.  Following high school, and at his mother's encouragement, Tyler decided to take a gap year during which he lived and worked in Spain and Romania.  He was particularly captivated by the simple life enjoyed by his Romanian host family—churchgoing, loving, and humble—and idealized it to be his own lifestyle.

After his gap year, Tyler enrolled at Cornell University to study biomedical engineering.  Unfortunately, rather than easing into collegiate life, Tyler opted for a challenging courseload and discovered he could not balance the demanding schedule.  He could not pass calculus and chemistry, and the University placed him on required academic leave for his freshman spring semester.  During this time, Tyler and his family moved to Bluffton, South Carolina.

Upon some self-reflecting, Tyler decided not to return to college and enlisted in the Marine Corps.  After basic and specialty training, Tyler was discharged to the reserves.  He returned to Bluffton and held several jobs before starting his own

business, Technology King of the Lowcountry.  Tyler began regularly attending religious services at Christian Renewal Church.

### III.   Just Punishment, Deterrence, Public Protection, and Rehabilitation

####    A.    Just Punishment

Tyler has now been convicted of criminal offenses involving two separate incidents: (1) the Capitol riot and (2) the August 2017 Unite the Right rally in Charlottesville, Virginia.  He was 22 years old at the time of Capitol riot and 19 at the time of Charlottesville.  Tyler's young age factored into his commission of both offenses.  As detailed below, although Tyler was legally an adult, he was well below 25 years old, the age at which the consensus of scientific and legal authorities agree the brain has matured.  Both scientific data and Supreme Court precedent explain the delayed brain development of young adults.

"[Y]outh is more than a chronological fact."  *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).  "It is a time of immaturity, irresponsibility, impetuousness, and recklessness.  It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage.  And its signature qualities are all transient."  *Miller v. Alabama*, 567 U.S. 460, 476 (2012) (cleaned up).

"[D]evelopmental psychologists and neuroscientists have found that biological and psychological development continues into the early twenties, well beyond the age of majority."  Elizabeth S. Scott, Richard J. Bonnie & Laurence Steinberg, *Young Adulthood As A Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016).  "Studies of behavioral,

psychological, and neurobiological development indicate that the years from the late teens to the early twenties constitute a transitional period that bridges adolescence and mature adulthood." *Id.* at 645. "[Y]oung adulthood is both the stage during which criminal behavior is most common and the period during which the vast majority of offenders begin desisting from crime. In this regard, young adulthood is arguably the most significant transitional period in the development of criminal behavior." *Id.*; *see generally Roper v. Simmons*, 543 U.S. 551, 569–70, 573 (2005) (relying on research by Scott and Steinberg).

Specifically, the frontal lobe of the brain is one of the last cerebral areas to develop. *United States v. Nance*, 957 F.3d 204, 217 (4th Cir. 2020) (Gregory, C.J., concurring). This development occurs well into a person's mid-twenties. *Id.* The frontal lobe is "responsible for important functions such as planning, organizing information, and thinking about possible consequences of action." *Id.* (internal quotation marks omitted).

The United States Sentencing Commission has acknowledged the "growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." U.S. Sentencing Commission, *Youthful Offenders in the Federal System* at 5 (May 25, 2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf (last visited July 6, 2024). The Sentencing Commission has observed the "significant debate among policymakers regarding the age at which a person should be held responsible for their actions

8

because of different stages of brain development." *Id.* at 7.  However, "researchers agree that the prefrontal cortex is not complete by the age of 18" and that brain "development continues into the 20s." *Id.*

The foregoing authorities all point to a conclusion that Tyler is far less likely to engage in criminal activity than in the past.  Now that he is 26 years old with a fully mature brain, he far less likely to act impulsively and take actions without considering their consequences.  Significantly, the Sentencing Commission has proposed a Guidelines amendment dealing with youthful offenders, which is discussed below.

Cited earlier is the seminal decision of *Gall v. United States*, one of the guiding legal standards for sentencing in Tyler's case.  *Gall* involved a 21-year-old defendant who was invited to join a drug distribution conspiracy.  552 U.S. 38, 41 (2007).  He was responsible for the distribution of 2,500 grams of ecstasy, the equivalent of 87.5 kilograms of marijuana.  *Id.* at 42.  The presentence report recommended a Guidelines range of 30 to 37 months' imprisonment, and the Government asked for a sentence within that range.  *Id.* at 43.  However, the district court sentenced the defendant to 36 months' probation, relying in great part on "his age at the time of the offense conduct." *Id.* at 44.  The Supreme Court upheld the sentence, approving the district court's finding regarding the defendant's immaturity:

> Immaturity at the time of the offense conduct is not an inconsequential consideration.  Recent studies on the development of the human brain conclude that human brain development may not become complete until the age

9

> of twenty-five.  The recent National Institutes of Health
> report confirms that there is no bold line demarcating at
> what age a person reaches full maturity.  While age does
> not excuse behavior, a sentencing court should account for
> age when inquiring into the conduct of a defendant.

*Id.* at 58 (cleaned up).

In Tyler's case, he was only 22 years old when he went to Washington, D.C. and participated in the Capitol riot.  His young age almost certainly made him more vulnerable to the relentless reports by media and then-President Trump's own campaign that the election had been "stolen."  *See generally* Eveline A. Crone & Elly A. Konijn, *Media Use and Brain Development During Adolescence*, National Library of Medicine, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5821838 (last visited July 7, 2024) ("[A]dolescents are highly sensitive to acceptance and rejection through social media, and that their heightened emotional sensitivity and protracted development of reflective processing and cognitive control may make them specifically reactive to emotion-arousing media.").  Tyler's young age almost certainly made him more susceptible to act impulsively as he attended the rally and then followed others towards the Capitol.

Judges presiding over January 6 cases have accounted for the defendant's youth when imposing a sentence.  In *United States v. Bruno Cua*, Judge Moss sentenced a defendant convicted of a § 111(a)(1) offense.  The defendant was 18 years old on January 6 and traveled to Washington, D.C. with his parents.  He was armed with pepper spray and a metal baton, and he climbed the scaffolding on the Capitol's west side.  Inside the Capitol Building, he encountered officers attempting

to lock the doors to the Senate Gallery.  He assaulted one of the officers by violently shoving the officer.  Consequently, other officers retreated from the doors without locking them.  The defendant rushed into the Senate Gallery and celebrated by yelling.  He reclined in the Vice President's chair and put his feet up on the desk. He helped other rioters enter the Senate Chamber.  Before and after the Capitol riot, the defendant posted on social media his belief that violence was necessary. The defendant faced a Guidelines range of 27 to 33 months' imprisonment; Judge Moss sentenced him to a year and a day.  Judge Moss repeatedly emphasized "the most important factor" in varying downward was the defendant's "youth and immaturity."  *United States v. Cua*, No. 1:21-cr-00107-RDM-1 (D.D.C.), ECF No. 373 at pp. 88, 95; *see also, e.g.*, *United States v. Rafael Rondon*, No. 1:21-cr-00722-JMC-1 (D.D.C.) (involving a defendant who was 22 years old when he committed felonious conduct on January 6, rejecting the Government's request for a 51-month prison sentence, and sentencing the defendant to 5 years' probation with 18 months of home incarceration and 350 hours of community service).

## B.    Adequate Deterrence

As to deterrence specific to Tyler, he does not need anywhere near a half-decade prison sentence to deter him from future criminal conduct.  Although he was convicted of an offense relating to the 2017 Charlottesville rally (the sole reason for his two criminal history points), he was not arrested and sentenced for that offense until last year.

Specifically, Tyler was arrested for the Charlottesville offense on March 17, 2023.  On May 25, 2023, he pled guilty and received an active prison sentence of six months.  PSR at ¶ 71.  He was released from state custody on July 17, 2023, and immediately arrested on the criminal complaint filed in the instant case.  ECF Nos. 1 & 5.

Tyler's case is different from the usual case of recidivism—one where a defendant is incarcerated for a time, released back into society, and then later reoffends, thereby demonstrating the prior punishment had no deterrent effect. Tyler's state-custody sentence shocked him with an acute understanding of the severe consequences for breaking the law and the existential conditions of prison life.

After his arrest in the instant case, Tyler was released on an unsecured bond in the Western District of Virginia.  *United States v. Dykes*, No. 3:23-mj-00026-RSB (W.D. Va. July 19, 2023).  Tyler made his initial appearance in this District on August 1 and was granted a personal recognizance bond.  ECF No. 8-1.

Tyler has complied with his conditions of release for almost exactly one year now.  PSR at ¶ 14.  Those stringent conditions of release have included a curfew and electronic location monitoring.  Despite his demanding work schedule and the routinely congested traffic conditions in his region, Tyler has made every effort to be home on time to comply with his curfew.

Besides driving the nine hours to Washington, D.C. multiple times to attend his court appearances, Tyler received this Court's permission to travel across the

country last December.  ECF No. 20.  He traveled from South Carolina to Arizona for employment-related training and returned with no issues.  ECF No. 20. Moreover, Tyler's curfew has incrementally been shortened so that he can fulfill his many employment obligations.  ECF No. 24.  It has not been uncommon for him to work twelve-plus hour days.  Tyler is a tireless worker and has strived to maintain full-time employment throughout the course of this case.  He will be employed at the time of the sentencing hearing.  PSR at ¶ 93.  Notably, continuing or seeking employment was not an ordered condition of release.  *See* ECF No. 8 at p. 2.

Tyler recognizes, of course, that this Court must consider general deterrence. But, even there, the sentence need not be lengthy to provide a deterrent effect.  A below-guideline sentence will still have a strong general deterrent effect.  "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime."  *United States v. Slatten*, 865 F.3d 767, 819 (D.C. Cir. 2017).

"In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that "the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment."  *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) (brackets omitted) (quoting U.S. Dep't of Justice, Nat'l Inst. Just., *Five Things about Deterrence* 1 (2016), *available at* https://www.ojp.gov/pdffiles1/nij/247350.pdf (last visited July 8, 2024)).

*Severity* refers to the length of a sentence.  Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect.

*Certainty* refers to the likelihood of being caught and punished for the commission of a crime. Research underscores the more significant role that certainty plays in deterrence than severity—it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In addition, there is no evidence that the deterrent effect increases when the likelihood of conviction increases. Nor is there any evidence that the deterrent effect increases when the likelihood of imprisonment increases.

*Id.* (ellipsis omitted).

### C.    Protecting the Public & Rehabilitation

A shorter custody sentence in this case will still protect the public.  Tyler's offenses occurred at large political rallies where he was surrounded by people who were also committing criminal offenses.  Tyler did not plan the Capitol riot or encourage anybody to attend.  He did not come to fisticuffs with any law enforcement officers.  Multiple factors demonstrate Tyler will not reoffend.  Since he was released in July 2023, Tyler has shown over a substantial period of time that he can conform his conduct to societal norms—and meaningfully contribute to society. Indeed, his conduct on bond has been exemplary.

Tyler does not possess a criminal history that suggests a lengthy custody sentence is necessary to protect the public.  He is an honors high school graduate with vocational skills extending across an impressive array of fields: computer

science, information technology, tile, roofing, and water treatment systems, just to name several. Moreover, he will not engage in criminal behavior because of substance abuse; Tyler does not have a substance abuse problem. His stable family and loving parents will be there to provide support for him; and they already need his support. Tyler is smart, self-sufficient, and a hard worker. He can and will maintain stable employment. Even United States Probation has recognized Tyler is not a flight risk or a danger to the community. ECF No. 39 at p. 2.

## IV.   Kinds of Sentences, the Guideline Range, and Policy Statement

The PSR correctly calculates an advisory Guideline range of 51 to 63 months' imprisonment. However, a sentencing court cannot "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.* For many of the same reasons discussed above, Tyler implores this Court not to impose a Guideline sentence.

Recently, the Sentencing Commission proposed an amendment to the policy statement at USSG § 5H1.1 to address youthful individuals. Absent action by Congress, the amendment will become effective on November 1, 2024. It provides:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally

15

are more impulsive, risk-seeking, and susceptible to
outside influence as their brains continue to develop into
young adulthood.  Youthful individuals also are more
amenable to rehabilitation.

The age-crime curve, one of the most consistent findings
in criminology, demonstrates that criminal behavior tends
to decrease with age.  Age-appropriate interventions and
other protective factors may promote desistance from
crime.  Accordingly, in an appropriate case, the court may
consider whether a form of punishment other than
imprisonment might be sufficient to meet the purposes of
sentencing.

U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 89 Fed. Reg.

36,853, 36,859 (proposed May 3, 2024).  This amendment aligns "with the

Commission's statutory duty to establish sentencing policies that reflect

'advancement in knowledge of human behavior as it relates to the criminal justice

process,' 28 U.S.C. [§] 991(b)(1)(C)."  *Id.* at 36,860.  The "amendment reflects the

evolving science and data surrounding youthful individuals, including recognition of

the age-crime curve and that cognitive changes lasting into the mid-20s affect

individual behavior and culpability."  *Id.*  Finally, it "reflects expert testimony to the

Commission indicating that certain risk factors may contribute to youthful

involvement in criminal justice systems, while protective factors, including

appropriate interventions, may promote desistance from crime."  *Id.*

Tyler was youthful both at the time of January 6 and Charlottesville.  He was

"impulsive, risk-seeking, and susceptible to outside influence," as best illustrated by

the fact that his crimes occurred at mass gatherings where other rioters were also

engaging in criminal conduct.  Tyler is more amenable to rehabilitation than is a

hardened career criminal, and his case presents an appropriate one in which to consider alternatives to a lengthy prison sentence.

## V.   Need to Avoid Sentencing Disparities

Courts sentencing January 6 defendants "must consider 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Webster*, 102 F.4th 471, 490 (D.C. Cir. 2024) (quoting 18 U.S.C. § 3553(a)(6)).  It is equally important to consider the sentences of defendants who went to trial versus sentences of those who pled guilty.

This Court should compare Tyler's case with other January 6 cases where defendants engaged in arguably more violent conduct, yet received sentences lower than Tyler's advisory range of 51 to 63 months' imprisonment.  The following examples involve convictions under 18 U.S.C. § 111(a)(1):

- Mark Leffingwell was a military veteran.  He went to the Senate Wing entrance where police officers had formed a defensive line.  He stood at the front of a giant crowd of rioters stacked hundreds deep behind him. He chanted and mocked the officers, and he told other rioters to stand their ground.  Leffingwell punched two police officers in the head.  He was sentenced to 6 months' imprisonment.  *United States v. Leffingwell*, No. 1:21-cr-00005-ABJ-1.

- Bobby Russell confronted officers at a line of bike rack barricades and resisted their efforts to get him to back away from the barricade.  He clung to a barricade despite being doused with OC spray.  When the barricade broke apart, Russell grabbed a police officer's jacket, pulling the officer down with him as he fell headlong down a short flight of stairs. Later, Russell refused orders to leave the area near the Senate Wing Doors and pushed with his back and buttocks into the riot shields of several officers.  Russell was sentenced to a year-and-a-day imprisonment. *United States v. Russell*, No. 1:23-CR-00029-APM.

17

- Bruno Cua (discussed earlier) was armed with pepper spray and a metal baton.  He violated shoved an officer, whereupon other officers retreated from the doors to the Senate without locking them.  Cua rushed into the Senate Gallery where he reclined in the Vice President's chair and put his feet up on the desk.  He helped other rioters enter the Senate Chamber. Before and after the Capitol riot, the defendant posted on social media his belief that violence was necessary.  He was sentenced to a year-and-a-day imprisonment.  *United States v. Cua*, No. 1:21-cr-00107-RDM-1.

- Joshua Portlock pushed open a barricade, wrenched it away from police, and carried it into a crowd of rioters.  This helped other rioters create more gaps in the police line.  Portlock picked up a large piece of plywood, and with another rioter's help, pushed the plywood into and against the line of officers. He and other rioters then pushed the plywood over the officers, and it landed on top of the officers.  While the officers were occupied with the plywood, other rioters attacked them.  After sustaining repeated assaults from Portlock and his fellow rioters, officers were forced to abandon their defensive line and fall back.  Portlock went toward the Tunnel, where some of the most violent confrontations between rioters and officers occurred on January 6.  There, he participated in "heave-ho" pushes against police, which involved multiple rioters collectively leaning back and then pushing forward against officers while chanting "heave-ho" to coordinate their efforts.  On at least two occasions, Portlock passed stolen police riot shields to the front line of rioters, which assisted those rioters in their assaults on officers.  Portlock was sentenced to 20 months' imprisonment.  *United States v. Portlock*, No. 1:22-CR-00067-CJN.

- Joseph Fisher was present at the early stages of breach of the Senate Wing Door.  He was in the Capitol Building when another rioter sprayed a chemical irritant at a police officer.  The officer chased the rioter through a hallway attempting to apprehend him. Fisher grabbed a chair, watched and waited as the rioter and officer approached his position, and rammed the chair into the officer.  Fisher then grabbed the officer and pushed him as another rioter shoved the officer from behind.  Fisher was sentenced to 20 months' incarceration.  *United States v. Fisher*, No. 1:23-cr-00305-RDM-1.

- Tucker Weston helped remove a metal barricade and shoved officers trying to prevent the rioters from moving closer to the Capitol Building. He shoved police officers attempting to subdue another rioter.  He clenched his fist at police and used a bike rack to push against police.  He entered the Capitol through a broken window.  He kicked and smashed the media equipment.  Weston was sentenced to 24 months' imprisonment.  *United States v. Weston*, No. 1:23-cr-00174-RBW-1.

- Matthew Brackley attended the "Stop the Steal" rally and walked to the Capitol Building wearing a camouflage hat and sunglasses. He ascended the Northwest Stairs and entered the Senate Wing Door; inside the Capitol, two police officers stopped him and told him to "back up." Brackley turned to the crowd behind him, shouted, "Let's go!", leaned forward, and pushed through the two officers. He led the crowd behind him towards the Senate Chamber. He encountered a group of police officers in riot gear and told them to "stand down" and "let us through." He remained in front of other rioters during a standstill, pushing against police officers. He retreated only after being sprayed with chemical munitions. He was in the Capitol Building for over 40 minutes. Brackley was sentenced to 15 months' incarceration. *United States v. Brackley*, No. 1:24-cr-00009-CJN-1.

- Troy Sargent scaled a media tower, videorecorded himself bragging about his involvement, and approached a faltering line of U.S. Capitol Police officers on the West Plaza and smacked an officer in the head. He subsequently swung his hand towards the same officer but missed. Sargent later posted on Facebook that he had seen police "throwing them flash grenades into the crowd" and that he had to "go get me some." He bragged about punching the officer "as hard as [he] could" and claimed he had "[p]unched the cop 3 times." Sargent was sentenced to 14 months' imprisonment. *United States v. Sargent*, 103 F.4th 820, 824–25 (D.C. Cir. 2024).

- Jason Farris advanced to the front of a mob of rioters and confronted a line of police officers. Other rioters grabbed a metal bicycle rack while police officers were holding onto it. Farris approached an officer from behind and shoved him with two hands, knocking him to the ground. The officer fell and released the bicycle rack. After the officer got up, a rioter threw a large wooden beam that struck the officer in the head. The impact of the object knocked the officer to the ground and caused him to lose consciousness. The officer was later diagnosed with a concussion. Farris' actions helped created a gap in the police line and enabled rioters to overwhelm police. He later climbed atop a window-washing platform and used a flagpole to repeatedly hit a window of the Capitol Building. Farris pleaded guilty and was sentenced to 18 months' imprisonment. *United States v. Farris*, No. 1:23-cr-00068-ABJ.

- Justin Dee Adams walked straight at officers and pushed into them. After Adams was pushed back, he turned and charged at the police line, attacking the police officer and other officers who attempted to push him back. He struck an officer twice in the head with his hands. One blow hit

the officer in the face mask, and the other blow hit the officer in the face underneath the mask.  Later, Adams pulled a bicycle rack barricade away from police and threw a water bottle at a police officer.  Rioters then overwhelmed police and surged through the gap that Adams had created, flooding into the West Plaza of the Capitol. The police defensive line crumbled in multiple places and a general retreat was called. Many of these rioters subsequently entered the Capitol building.  Adams was sentenced to 17 months' imprisonment.  *United States v. Adams*, No. 1:22-cr-00350-JEB-1.

- Grady Owens was 22 years old at the Capitol riot.  He came to Washington, D.C. with his father and codefendant, Jason Owens.  Grady slammed an officer with a skateboard.  Meanwhile, Jason shoved an officer in the face hard enough for the officer's head to snap back.  A clash then erupted between other rioters and officers, provoking additional assaults on more officers.  Grady and Jason joined a crowd that attempted to push their way into the East Rotunda doors.  The crowd was pushing, grabbing, and swinging at police officers.  Jason fought with an officer near the doors, grabbing his baton and struggling over it.  Grady was sentenced to 37 months' imprisonment and the younger Jason to 24 months' imprisonment.  *United States v. Owens*, No. 1:21-cr-00286-BAH.

- Dillon Herrington was at the front of a huge crowd of rioters confronting and taunting officers who were attempting to maintain a defensive police line.  He was armed with a taser and a large military-style knife.  Herrington repeatedly approached police officers, pointing at them, raised his middle finger, and sought to intimidate them with physically aggressive behavior.  Herrington threw water at police and was sprayed with a chemical agent. In response, he threw an empty plastic water bottle, a COVID mask, and a full water bottle toward officers.  He launched a 4x4 piece of lumber at an officer, who fortunately moved just in time to avoid being struck.  Herrington picked up a bike rack and approached officers. He abruptly threw down the bike rack and changed direction after being sprayed by a chemical agent.  He threw an object labeled "DANGER HIGH VOLTAGE" at officers.  Herrington was sentenced to 37 months' imprisonment.  *United States v. Herrington*, No. 1:23-cr-00199-BAH.

There are many cases involving different convictions but with comparable or worse conduct.  The sentences in those cases are noteworthy; to list a few:

- Narayana Rheiner pushed against officers, grabbed an officer's riot shield, and pulled the shield from the officer's hands, causing the officer to fall down several stairs onto the ground.  He encouraged other rioters to help

him breach a police line.  "Both on the Capitol grounds and inside the Capitol building, [Rheiner] could not be deterred.  He continually advanced even though officers sprayed him repeatedly with pepper spray."  Rheiner had a criminal history category of IV.  Rheiner pled guilty to civil disorder in violation of 18 U.S.C. § 231(a)(3) and was sentenced to 15 months' imprisonment.  *United States v. Rheiner*, No. 22-CR-108 (DLF), 2024 WL 2251875, at *2 (D.D.C. May 17, 2024).

- Dylan Cronin participated in the first breach of the Capitol at the Senate Wing Door.  He sprayed a fire extinguisher at police.  He kicked the exterior of the Senate Wing Door and used a piece of lumber to break a windowpane.  He was the thirteenth rioter to enter the Capitol, subsequently reentered the Capitol multiple times, and went into the U.S. Senate side, the U.S. House of Representatives side, the Crypt, the Memorial Door, and the Statuary Hall.  He showed no remorse and gave false statements to the FBI.  Cronin pled guilty to two misdemeanors—18 U.S.C. § 1361 and 18 U.S.C. § 1752(a)(1)—and was sentenced to eight months' incarceration.  *United States v. Cronin*, No. 1:22-cr-00233-ABJ-3.

- Darrell Youngers scaled a wall, filmed a confrontation between rioters and police, entered the Senate Wing door within ten minutes of the initial breach.  He declared "this is what a revolution mother***ing looks like" and collected a souvenir piece of broken glass.  He swatted at a police officer, encouraged other rioters, and filmed another video celebrating the Capitol breach.  He engaged in felonious conduct but pled guilty to a misdemeanor—40 U.S.C. § 5104(e)(2)(G)—and was sentenced to 36 months' probation.  *United States v. Youngers*, No. 1:21-cr-00640-TFH-2.

- James Epps, Sr. inspired and gathered a crowd to storm the Capitol, was present while rioters overwhelmed police at three key breach points, pushed a large metal-framed sign into a group of police officers holding a defensive line, and participated in a scrum-like effort to push past that police line.  He engaged in felonious conduct but pled guilty to a misdemeanor—18 U.S.C. § 1752(a)(2)—and was sentenced to 12 months' probation.  *United States v. Epps*, No. 1:23-cr-00321-JEB-1.

Tyler asks this Court to consider not only the above cases but also his timely guilty plea in deciding the sentence to impose.  A court may "extend a proper degree of leniency in return for [a] guilty plea[]."  *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)).  A

court can show more leniency to a defendant who shows "acceptance of responsibility by acknowledging his guilt at an earlier stage" of the proceeding. *Id.* "[I]t is equally lawful for a court to give a downward variance to a more cooperative defendant while denying the variance to a more litigious defendant." *Id.*

## VI.   Need to Provide Restitution

Tyler has agreed to pay $2,000 restitution pursuant to his plea agreement. ECF No. 32 at p. 9.  He intends to pay the full amount before sentencing.

## VII.   The Collateral Consequences to Tyler

After the Marine Corps, Tyler had to build a life in Bluffton, South Carolina. The COVID-19 pandemic complicated his plans.  He did find work, most prominently with a tile company.  He started a second job in the area helping people with their computers and related technology issues.

After his computer business rapidly became successful, Tyler left the tile company to begin working fulltime with his own business, Technology King of the Lowcountry.  The business catered to elderly retirees in the greater Bluffton/Hilton Head area. Tyler and his multiple employees made house calls to assist customers with their various computer needs.  The business became profitable.  PSR at ¶ 95. At its busiest, Technology King employed five people.

Tyler also invested in real estate.  He purchased two condominiums; he lived in one with a roommate who paid rent, and he leased the other.  Tyler hoped the

rental income would allow him to grow equity in these properties enabling him to manage them for a profit.[2]

When Tyler's arrest for January 6 was widely publicized in the media, Technology King lost its customers.  Tyler was expelled from the Chambers of Commerce in Bluffton and Hilton Head.  He was no longer allowed to advertise with Hilton Head Advertising (a digital media company) and the *Bluffton Sun* (a widely read local newspaper).  He lost a profitable referral partner in Business Networking International, which ceased doing business with Tyler.  Of Tyler's fifteen close friends, all but three abandoned him.  Even his church asked him to worship elsewhere.  Tyler's business losses have totaled at least $150,000.

Tyler has tried to bounce back.  He has taken sales jobs and worked them very hard. He continues to do so now, even on the eve of sentencing. But he is nowhere close to the soaring trajectory he experienced before his arrests relating to the Capitol riot and Charlottesville.  It will take years and endless work before he regains the trust of his friends and community.

Most notably, Tyler's father Scott is 86 years old.  Scott says it is painful for him to see the impact of his son's federal prosecution.  Scott comments that if his son receives a sentence within the projected Guidelines range, he may die before Tyler is released.  In Scott's own words, "My son will be gone to me."

---

[2] As for the current status of the condos, one is scheduled to be sold on July 17, 2024 (two days before sentencing).  Tyler anticipates a net profit of approximately $5,000.00.  Defense counsel have provided details of this sale to the Probation Office.

## Conclusion

Tyler hates his involvement in the Capitol riot.  He takes complete responsibility for his actions.  Tyler apologizes for those actions.  He apologizes to the United States Capitol Police Department and the Metropolitan Police Department.  He apologizes to his country.  He apologizes to this Court.

Based on Tyler's (1) youth at the time of his offenses, (2) compliance with the conditions of his release both before and after his conviction, and (3) the need to impose a fair sentence when considering similar January 6 cases, he humbly asks this Court to vary downward and impose a sentence of 24 months' imprisonment.

Respectfully submitted,

/s/ WILLIAM F. NETTLES, IV,
Federal Public Defender
1901 Assembly Street, Suite 200
Columbia, South Carolina 29201
Telephone:  803-765-5070
Attorney ID #: 5935

/s/ EDMUND G.M. NEYLE,
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite 105
Florence, South Carolina 29501
Telephone: (843) 662-1510
Attorney ID#: 13832

**Attorneys for Defendant**

Columbia, South Carolina

July 8, 2024