**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:23-cr-00266-BAH** |
| | : | |
| **TYLER BRADLEY DYKES** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Tyler Bradley Dykes to 63 months of incarceration, a sentence at the high-end of the applicable Sentencing Guidelines range, three years of supervised release, $2,000 in restitution, and a $200 mandatory special assessment.

## I.   INTRODUCTION

The defendant, Tyler Bradley Dykes—a 21-year-old who was then serving in the United States Marine Corps—violently wrenched a police riot shield out of the hands of officers defending the Capitol and twice used the shield to push his way through police lines during the January 6 attack on the U.S. Capitol, an unprecedented attack that interrupted certification of the Electoral College vote, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1]   As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

By January 6, 2021, Dykes already had demonstrated his penchant for ideological violence. In August 2017, he engaged in felonious conduct while at the Unite the Right Rally in Charlottesville, Virginia, for which he was later charged and convicted. Undeterred, Dykes's conduct on January 6 was even more egregious: after ripping out snow fencing and moving aside bicycle rack barricades on his approach to the Capitol, he led rioters charging through a small line of officers defending the stairs leading to the Capitol's East Rotunda Doors. After celebrating his victory of overwhelming those officers, Dykes forced his way to the very front of the mob that had cornered officers in front of the East Rotunda Doors. Ignoring pepper spray and flashbangs, Dykes (who stands about six feet and four inches tall) used the full force of his body to wrench a police riot shield from the hands of two Capitol Police officers. He then used that stolen police riot shield to force his way through officer lines twice, first to gain entry into the United States Capitol Building, and then as he made his way towards the Senate Chamber where the Electoral College Certification was scheduled to occur.

The government recommends that the Court sentence Dykes to 63 months of incarceration. A 63-month sentence reflects the gravity of Dykes's conduct and, in particular, the need for specific deterrence, where Dykes has already demonstrated his willingness to engage in violence in support of his ideological views and his likelihood of further recidivism.

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with in]dividual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.     **FACTUAL BACKGROUND**

A.     **The January 6, 2021 Attack on the Capitol**

The government refers the Court to the Statement of Offense in this case, ECF 1, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.     **Dykes's Role in the January 6, 2021 Attack on the Capitol**

 i.     *Dykes's Political Knowledge and Belief-Based Affiliations in/around January 6, 2021.*

In the months and days leading up to January 6, Dykes followed several Telegram groups discussing the 2020 Presidential election, alleged voter fraud, and the Electoral College Certification. As noted in Dykes's Statement of Offense (ECF 33), among the Telegram groups Dykes was following was one called "Britain First Party – Britain First – Taking Our Country Back." Some of the groups also promoted violence related to January 6, 2021 and advocated violent government overthrow. These discussions included quotations from Hitler and messages including, "Fuck peace. The time for peace has passed. Hail holy terror. Hail chaos" on January 6 and a celebration of violence in service of "Konservative Revolutions" on January 7.

 ii.    *Dykes's Arrival in D.C. and Pathway from the Stop the Steal Rally to the Capitol's East Side.*

Dykes arrived in the D.C. area in/around January 6, 2021, where he joined two friends from Bluffton, South Carolina. They were planning to, and did, attend the Stop the Steal Rally on January 6. On that day, Dykes wore blue jeans, black sneakers, a gray puffer jacket, black gloves, a tan Adidas baseball hat with black stripe, and a textured gaiter that he wore over his face the

entire day. In addition, one of Dykes's friends gave Dykes a cannister of pepper spray on the morning on January 6.

      After the former President's speech at the rally ended, Dykes and his friends began heading towards the Capitol.



*Image 1 (Ex. 1): Still from video of Dykes, with face covered, walking with his friends towards the U.S. Capitol Building.*

      As they got closer to the Capitol, they could see the violence that was already underway. At some point, Dykes's friends chose hang back and keep their distance from the building, but not Dkyes. Dykes chose to continue on towards the building. Shortly after the below video was taken, Dykes left his friends behind and continued towards the Capitol's east side. As seen below, as Dykes initially crossed over the northern part of the restricted area, he carried a large wooden stick or flagpole.



*Image 2 (Ex. 2): Still from video showing Dykes, with his face covered, walking within the restricted perimeter near the northwest corner of the Capitol, holding a large wooden stick or flagpole.*

Just after 1 p.m., after leaving his friends behind, Dykes approached a layer of snow fencing near the Capitol's northeast corner to which "AREA CLOSED" signs were affixed. Video footage shows a number of Capitol Police officers on a landing of the U.S. Capitol Building overlooking the area where the snow fencing had been placed. Despite the presence of those officers and ignoring the signs on the snow fencing, Dykes began ripping the snow fencing out of the ground and discarding it.





*Images 3, 4 (Ex. 3): Stills from video showing Dykes attempting to rip out snow fencing with "AREA CLOSED" signs as U.S. Capitol Police stand on a landing above him behind bike rack barricades.*

Shortly after rioters broke through the bike rack barricades protecting the restricted perimeter on the Capitol's east side, Dykes joined those rioters flooding into the restricted area and paused only to pull barricades out of the way so other rioters could more easily enter.

6



*Image 5 (Ex. 4): Still from video showing Dykes, with his face covered, doubling back to pull back bike rack barricades so additional rioters could flood into the restricted area.*

iii. <u>*Dykes Helped Lead the Charge in Overwhelming Officers on Stairs Leading to the East Rotunda Doors.*</u>

By approximately 2:05 p.m., the violent mob had successfully pushed the outnumbered U.S. Capitol Police officers backwards from their line on the east side of the Capitol. The mob then pushed those same officers backwards up the stairs leading to the East Rotunda Doors. Dykes was not among the first rioters to break through the east side perimeter, but he quickly rushed through to the front of the mob as approached the officers on the stairs.

As rioters around him screamed things like, "We're stormin' the Capitol, we broke through the barriers!!" and "We're pushin' our way up!!," Dykes began pushing with others at the front of the mob just one arm's length from Capitol Police officers. Dykes can be seen in pushing in CCTV at 2:05 p.m.:



*Image 6 (Ex. 5): Zoomed in CCTV still showing Dykes pushing his way through officers, forcing them to retreat backwards up the steps.*



*Image 7 (Ex. 6): Stills from video showing Dykes making his way to front of mob and succeeding in getting to landing in front of East Rotunda Doors.*

After reaching the top of the stairs, Dykes celebrated his accomplishment, performing what appears to be the Sieg Heil salute.



*Image 8 (Ex. 7): Still from video showing Dykes performing what appears to be the Sieg Heil salute after he arrives on the landing in front of the East Rotunda Doors.*

Minutes later, hundreds of rioters overtaken the platform area outside the East Rotunda doors. The mob had forced the small number of officers back into a small line in front of the doors leading into the Capitol. With their backs to the doors, the officers were attempting to prevent rioters from breaching the U.S. Capitol Building.

       *iv.*   *Dykes Incited Violence and Used a Stolen Police Riot Shield to Assault Officers Defending the East Rotunda Doors (Count Three).*

By approximately 2:24 p.m., the U.S. Capitol Police deployed a flashbang intended to disperse the violent crowd. Dykes was undeterred. When rioters already inside the Capitol pushed the East Rotunda doors open from the inside, rioters outside grabbed hold to keep them from

closing. During the roughly two minutes the doors were open, Dykes pushed forward in an attempt to get nearer to the open doors and inside the building. Dykes used his stature to his advantage when he reached forward to attempt to hold open the door, which had glass window panes that had already been shattered.



*Image 9 (Ex. 8): Still from video showing Dykes reaching to pull open East Rotunda Doors.*

Dykes remained at the very front of the mob for those one to two minutes. Taller than most rioters around him, Dykes appeared to be rallying others and began pulling at officers' police riot shields. Only after he was inadvertently hit with pepper spray that other rioters sought to use against the police did Dykes abandon his position at the front of the mob and retreat to safety.

Minutes later, around approximately 2:35 p.m., Dykes returned to the front of the mob as rioters outside chanted and rioters inside again tried to force open the East Rotunda doors. Officers defending the doors were sprayed with pepper spray, and Dykes capitalized on their

temporary defenselessness to reach forward and, with both hands, grab hold of a U.S. Capitol Police riot shield held by two police officers.

Using the weight of his entire body, Dykes battled with two officers as they fought to hold on to the shield.[2] Dykes eventually overcame the officers and successfully wrenched the shield from their grip and leaving off-balance and vulnerable. Dykes lifted the shield over his head and turned away from the doors.



---

[2] One of the officers is believed to be Lt. R.R., who has since left the Capitol Police. The government is still working to identify the second officer holding the shield, whose face was largely covered by his winter hat and a face covering.



*Images 10, 11 (Ex. 9): Stills from video showing Dykes battling to wrench a police riot shield away from the two Capitol Police officers who had been trying to retain control of it; he then re-orients himself with the shield, so he could turn back around towards the doors as the officers are left vulnerable to further attack.*

Immediately after stealing the shield, other members of the mob deployed more pepper spray in the direction of the now-unprotected officers, as well as the other officers around them. At the same time, rioters pushed against the officers and threw things at them. After repositioning himself and reversing the riot shield to hold it by the handles, Dykes turned back towards the East Rotunda Doors and the police line.

Dykes then began using the shield to forcibly push other rioters ahead of him, who in turn pushed up against the line of officers. At the time, Dykes advanced to within approximately ten feet of the East Rotunda Doors. He also used the stolen riot shield to obstruct and intimidate those same officers from continuing to defend their positions in front of the doors.



*Image 12 (Ex. 10): Still from video showing Dykes holding riot shield
and using it to push other rioters to get inside the building.*

By 2:39 p.m., the mob had successfully breached the East Rotunda Doors for a second time. Rioters, including Dykes, entered the U.S. Capitol Building around that time and Dykes continued to hold the police riot shield in front of him and use it to push his way inside.



*Image 13 (Ex. 11): Zoomed in CCTV showing Dykes among mob that overwhelmed officers to open the East Rotunda Doors and flood in.*

As Dykes entered the U.S. Capitol Building, the mob chanted, "Treason, treason, treason!"

Once inside, Dykes turned around to look out the door and, holding the riot shield in one hand, raised his other hand into a fist in celebration.



*Image 14 (Ex. 12): Still of video showing Dykes celebrating after successfully entering the U.S. Capitol Building.*

14

> *v.*  *Dykes Again Used the Stolen Police Riot Shield to Assault and Impede Officers*
> *Protecting Rioters' Advances Towards the Senate Chamber (Count Four).*

Inside the U.S. Capitol Building, Dykes entered the Capitol's Rotunda with the stolen police riot shield. By approximately 2:48 p.m., Dykes joined a group of rioters in the second-floor main hallway north of the Small Senate Rotund that was confronting Metropolitan Police Department ("MPD") officers. Those officers had formed yet another police line to prevent the angry mob from getting closer to the Senate Floor (at the end of the hall behind them). The group of rioters loudly chanted, "Whose house? Our house!" and "You serve us!"



*Image 15 (Ex. 13): Still of video showing Dykes preparing to push inside the in the second-floor main hallway, north of the Small Senate Rotunda.*

The mob began to push through that line of officers. A rioter next to Dykes, referring to him, exclaimed, "We got the riot shield!" A number of rioters began yelling "push!" while others yelled, "Get in there, get in there! They can't hold us!"

Dykes first pushed his way to the front of the group of rioters. Still wielding the stolen riot shield, Dykes used the shield to gain leverage while he and others pushed the line of MPD officers backwards, overwhelming their attempts to stop the mob from moving closer to the Senate Chamber. He used the shield to assault MPD officers as he forced them to retreat further down the hallway.



*Image 16 (Ex. 14): Still of video showing Dykes making his way to the front of the mob, then pushing MPD officers with the stolen police riot shield.*

As the mob forced the officers back, the rioters began chanting, "USA, USA, USA!" Dykes also continued holding the shield and using it to obstruct and intimidate the police officers defending that hallway.

By approximately 2:53 p.m., Dykes returned to the area just inside the East Rotunda doors and exited the U.S. Capitol Building. Before exiting and as he crossed the threshold of the Rotunda

doors, Dykes was still carrying the stolen police riot shield. Just after exiting the doors, Dykes surrendered the shield to an officer. *See* Ex. 15.

      vi.    *<u>Dykes Remained In/Near Restricted Capitol Grounds Until it Began to Grow Dark.</u>*

Sometime after exiting the U.S. Capitol Building, Dykes made his way to the west side of the U.S. Capitol grounds. After the Capitol's outdoor lights came on and the sky was visibly darkening, Dykes observed thousands of violent rioters who were still occupying the inaugural stage area on the west front. Dykes did not leave restricted Capitol grounds until after additional flashbangs and tear gas were deployed by law enforcement on the west front.



*Image 17 (Ex. 16): Still of video showing Dykes near the chaos on the Capitol's west front.*

     *vii.*    <u>*Dykes Closely Followed the Aftermath of January 6.*</u>

Dykes's cell phone contents reveal that he continued to follow the aftermath of January 6 after participating in the riot. For example, he saved a number of photos, posts, and articles to his phone regarding January 6, some of which make light of the seriousness of that day. Below are just a few samples of images and posts that Dykes saved to his cell phone following January 6, 2021. These examples are by no means exhaustive.



*Image 18: Image Dykes saved to his phone on January 7, 2021.*



*Image 19: Image Dykes saved to his phone on January 12, 2021.*

18



*Image 20: Image Dykes saved to his phone on January 13, 2021.*

### viii.   Dykes's June 2024 Debrief Interview.

On June 28, 2024, Dykes was interviewed by the D.C. United States Attorney's Office and the Federal Bureau of Investigation ("FBI") in a debrief session pursuant to paragraph two of Dykes's plea agreement, "Cooperation with Additional Investigation." *See* ECF 32 at 2. A summary of that interview is below.

**Credible Portions of Dykes's Debrief Interview**

Prior to January 6, Dykes had been to Washington, D.C. on a handful of occasions. In and around January 6, 2021, Dykes self-identified as a loyal Trump supporter, who followed politics more than the average citizen. He claimed the election was fraudulent, in large part because then-President Trump said so. A few weeks prior to January 6, he planned to go to D.C. for the Stop the Steal rally with his friends from Blufton, South Carolina.

On the morning of January 6, 2021, Dykes's friends gave Dykes a can of pepper spray "in case they got attacked," which Dykes accepted. Dykes and his friends then made their way to the

Ellipse to hear then-President Trump speak. They eventually got close enough to hear Trump's whole speech at the Ellipse. By that point, at a minimum, Dykes understood that Congressmen and women were in the Capitol that day, and that the Electoral College Vote count would be taking place inside the U.S. Capitol Building.

After the speech, Dykes and his friends walked down what Dykes belived to be Consittution Avenue towards the Capitol. However, as they began to see what was transpiring on Capitol grounds, Dykes's friends opted to hang back and keep their distance from the Capitol Building. Dykes, on the other hand, wanted to get closer to "see what was going on" – he saw the commotion happening at the Capitol, and he wanted to get into the action.

Dykes then confirmed the basic details of what video and photographic evidence showed regarding his conduct, including ripping up snow fencing, moving bike rack barricades, pushing officers up the stairs leading to the East Rotunda Doors, and Dykes's two assaults using the stolen police riot shield. Dykes's explanation for this conduct, especially the more violent conduct, was that it was a "hyper environment" and he became "adrenalized." He admitted his conduct was "stupid." Although he recognized how severely outnumbered law enforcement was on that day, Dykes acknowledged that he was primarily concerned about his own safety, not the safety of the officers.

Also, when asked why Dykes was so consistent about wearing his neck gaiter all day on January 6 to cover his face, Dykes explained that he felt it was necessary for his "safety" due to his prior involvement in the 2017 Unite the Right Rally in Charlottesville, Virginia (discussed further below). He stated he had observed how other Unite the Right Rally attendees had been

doxed online, which had led to economic uncertainty due to the loss of their jobs, for example. Therefore, because his ties to the 2017 Unite the Right Rally had not been revealed publicly (and he was not aware he was being investigated at the time of January 6), he wanted to "eliminate any possible risk of pictures going online" from January 6 that might show his face and identify his connection to the Charlottesville events. Dykes said he felt the general public perceived the 2017 Unite the Right Rally events as "worse than any actions taken" at those events.

Throughout the debrief interview, Dykes reiterated that during the violence on the day of January 6, Dykes's main concern was for himself: his own physical safety and wellbeing.

### Non-Credible Portions of Dykes's Debrief Interview

In the debrief interview, Dykes made certain false statements, minimized his conduct, and told non-credible versions of certain details regarding his behavior, likely in an effort to downplay his troubling association with violent extremist organizations and his propensity and affinity for ideological violence.

Dykes claimed to have left South Carolina to drive to D.C. in the mid-morning of January 5. He claimed to have arrived in D.C. once it was dark on January 5, but in time to have dinner with his two South Carolina friends who were already in D.C. In fact, Dykes was in Florida on January 5, 2021. Toll records received in response to a Verizon subpoena indicate that Dykes was in Marathon, Florida around 3:20 p.m. on January 5, 2021. Furthermore, Dykes's cell phone indicates that he traveled by airplane, or attempted to, on January 5, 2021:



*Image 21: Image Dykes saved to his phone on January 5, 2021 at 7:53:37 p.m. (EST).*

In addition, the Verizon toll records indicate that he was about an hour from his home in South Carolina around 12:30 a.m. on January 6. These false statements appear to have been made to conceal Dykes' presence in Florida prior to traveling to Washington, D.C., and raise questions about the purposes of his Florida trip.

When asked whether Dykes discussed the events of January 6 with anyone, either in person or electronically, Dykes said "not really." This answer also was not credible, given a witness told the FBI that after January 6, Dykes posted some sort of "manifesto" online about the days' events. In addition, as noted in the statement of facts in this case (ECF 1-1 at 2-3), in December 2021, the FBI received information from an anonymous tipster that Dykes had entered the U.S. Capitol on January 6, 2021 and assaulted law enforcement officers.   The tipster wrote as follows:

> The suspect is Tyler Dykes. Lives in Bluffton, SC. I [was with Dykes] and we
> started talking about the January 6th attack. We had differing opinions about it but
> was respectful. He then told me about how he went into the capital with a mask on
> with the other rioters and started beating up police officers. He states he was still in
> the military at the time. He said he has video evidence of him being there but he
> did not show me since we were in a public setting. He was there for "fun" and
> wanting to make a statement. He was there with other group of people but would
> not state who. I believe he was telling the truth about it and I believe he needs to be
> investigated.

*Id.* The tipster also provided an accurate cell phone number for Dykes. *Id.* Dykes also stated he

"did not believe" he had his cell phone with him on January 6, 2021, despite that the is captured

in photographic evidence holding his phone that day, and despite that the Verizon toll records

indicate that Dykes exchanged calls with one of the two South Carolina friends twelve times

between 2:59 p.m. and 6:26 p.m. on that day.

Similarly, as discussed further below, Dykes is known to have communicated with others

via Telegram, however, very few outgoing messages remained on his device by the time it was

seized in this case. His usernames on that platform were "Rogerup" and "Nocturnal Wolf," and he

saved countless images to his phone depicting images with wolves and a symbol known as

"Wolfsangel." This symbol, which appears similar to a swastika, is commonly known to be a logo

for neo-Nazis in the United States and Europe. Below are a few examples of such images, which

Dykes saved to his phone after January 6:

  

*Image 22, 23,[3]  24: Images Dykes saved to his phone after January 6 depicting "lone wolves" and the Wolfsangel symbol.*

Yet when questioned during the debrief on his use of the usernames "Rogerup" and "Nocturnal Wolf," Dykes denied having any particular reason for selecting and using them.

Similarly, when asked whether he performed the Sieg Heil salute on January 6 after he successfully reached the top of the East Rotunda stairs, Dykes was adamant that he did not give any "salute." However, this claim is contradicted by what is depicted in Image 8 (Ex. 7), *supra* at page 9, which clearly shows Dykes raising his open right hand towards the crowd (different from the closed fists that we see others raising around him in that exhibit, and different from the raised fist we see Dykes raise to celebrate getting inside the U.S. Capitol Building, as shown in Image 14 (Ex. 12), *supra* at page 14). Again, Dykes's denials during the debrief appear to have been made in an effort to downplay Dykes's troubling association with these organizations and his propensity and affinity for ideological violence, as discussed further below.

---

[3] This image appears to depict patches used by the "Azov battalion," a controversial Ukrainian volunteer battalion "that has been doing much of the frontline fighting in Ukraine's war with pro-Russia separatists." *See, e.g.,* https://www.theguardian.com/world/2014/sep/10/azov-far-right-fighters-ukraine-neo-nazis.

### III.    THE CHARGES AND PLEA AGREEMENT

On August 8, 2023, Dykes was indicted on ten charges: Robbery and Aiding and Abetting, in violation 18 U.S.C. §§ 2111 and 2 (Count 1);   Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 2); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts 3 (USCP Officers) and 4 (MPD Officers)); Entering or Remaining in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 5); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count 6); Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous or Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count 7); Disorderly Conduct in a Capitol Building or Ground, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count 8); Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count 9); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count 10).

On April 19, 2024, pursuant to a plea agreement, Dykes pleaded guilty to the lesser included offenses of Counts Three and Four, charging him with violating 18 U.S.C. § 111(a)(1), each with dangerous weapon enhancements under U.S.S.G. § 3A1.2(c)(1). *See* ECF 32. Dykes also agreed to pay $2,000 in restitution to the Architect of the Capitol and a $200 mandatory special assessment. *Id.*

### IV.     STATUTORY PENALTIES

Dykes now faces sentencing on the two counts listed above. The maximum term of incarceration for a violation of 18 U.S.C. § 111(a)(1) is eight years. The Court may also impose a term of supervised release of not more than three years and a fine of up to $250,000, and the Court must impose a mandatory special assessment of $100 per felony count. He also must pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. ECF 38. According to the PSR, the U.S. Probation Office calculated Dykes's adjusted offense level under the Guidelines as follows:

Count Three (Assault of U.S. Capitol Police Officers)

| U.S.S.G. § 2A2.2 | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | | +4 |
| U.S.S.G. § 3A1.2(c)(1) | Official Victim Adjustment | | +6 |
| | | **Total** | **24** |

Count Four (Assault of Metropolitan Police Department Officers)

| U.S.S.G. § 2A2.2 | Base Offense Level | | 14 |
|---|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | | +4 |
| U.S.S.G. § 3A1.2(c)(1) | Official Victim Adjustment | | +6 |
| | | **Total** | **24** |

### Unit Analysis

Pursuant to U.S.S.G. § 3D1.4, because each count involves different law enforcement officer-victims, the counts do not group. Therefore, one unit is counted for Count Three, which constitutes Group One. An additional unit is counted for Count Four, which constitutes Group Two.

### Total Offense Level

A total of two units results in an increase of two points to the group with the highest offense level (24), for a total offense level of 26. A three-point reduction for acceptance of responsibility results in a final total offense level of 23.

The U.S. Probation Office calculated Dykes's criminal history as category II, which is not disputed. PSR ¶¶ 71, 72. Accordingly, Dykes's Guidelines imprisonment range is, therefore, 51 to 63 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a). The Section 3553(a) factors weigh in favor of a term of incarceration at the mid-level of the applicable Guidelines range.

### A.    The Violent Nature of the Offenses Support a Sentence at the Top of the Guidelines Range.

Dykes's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). This Court and others concurred. *See United States v. Chrestman*, 21-mj-218 (BAH), 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law."); *United States v. Foy*, 21-cr-108 (TSC) (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Cua*, 21-cr-107 (RM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (describing the riot as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself").

Dykes was among a small group that led the charge through the outnumbered police on the East Rotunda steps. He directly contributed to some of the most extreme violence on the Capitol's east front. Dykes's assault involving the stolen police riot shield at the East Rotunda Doors left

those officers exposed and vulnerable, directly contributing to and exacerbating additional pepper spray and other attacks those officers experienced. Similarly, Dykes's use of the stolen police riot shield inside the U.S. Capitol Building directly contributed to those officers' forced retreat further down the second-floor main hallway, which, in turn, allowed the mob to get closer to the Senate Chamber. Although Dykes's assaults did not result in known injuries, Dykes was an active participant in a violent mob that left numerous officers seriously injured.

The nature and circumstances of Dykes's crimes are of the utmost seriousness and fully support the government's recommended sentence of 63 months' incarceration.

**B. A Sentence at the Top of the Guidelines Range is Appropriate Given Dykes's History and Characteristics, Including His Demonstrated Propensity and Affinity for Ideological Violence and Troubling Association with Violent Extremist Organizations.**

Dykes's family history and education provided him with ample opportunity to succeed and make lawful choices. Dykes has had supportive family, a good education, financial stability, and no significant health issues; his crimes were not crimes driven by poverty, neglect, or abuse. Despite his advantages, Dykes's criminal and other history demonstrate an affinity for violence and, in particular, ideologically-motivated violence. Dykes committed ideological violence (discussed below) in August 2017 at the Unite the Right Rally in Charlottesville, Virginia, just before his brief stint at Cornell University in the fall of 2017, and only four months before Dykes joined the United States Marine Corps. *See* PSR ¶ 92. Dykes was later discharged from the United States Marine Corps under other than honorable conditions for participating in prohibited activities, namely, "participating in extremist behavior or about" November 8, 2020. Rather than honor his oath to protect and defend the Constitution, Dykes's criminal activity on January 6 shows

he was instead choosing to violate it.

> i.   _Dykes's Participated in the 2017 Unite the Right Rally._

Dykes's participated in ideological violence at the Unite the Right Rally in Charlottesville, Virginia in August 2017. Video footage shows Dykes during the daytime evidently suffering from the effects of pepper spray (below, left). During the evening's events, Dykes carried a lit torch, performed the Sieg Heil salute, and he marched with others to express his white supremacist views, as depicted in the still image below (right).



_Images 25 (Ex. 17), 26: Still from video and photograph depicting Dykes at the Unite the Right Rally in Charlottesville, Virginia in August 2017._

As a result of those events, Dykes was prosecuted and convicted for burning an object with intent to intimidate, a felony in Virginia. _See_ PSR ¶ 71. However, video footage of the evening events shows Dykes engaging in assaultive conduct, as shown in the still images below.[4]

---

[4] The below still images are provided to assist the Court in reviewing the video exhibit, which is dark.



*Images 27, 28, 29 (Ex. 18): Stills from video depicting Dykes assaulting other individuals at the Unite the Right Rally in Charlottesville, Virginia in August 2017.*

ii.  *Dykes's Demonstrated Interest in Ideological Violence Continued after January 6, 2021.*

Beyond participating in January 6, Dykes's cell phone contents in 2021 and beyond show a continued interest in ideological violence. The vast majority of the hundreds of images saved on Dykes's cell phone revolve around extremist ideology and ideological violence, namely, white supremacy and Antisemitism. In addition, in February 2021, Dykes began saving diagramed instructions on how to carry out additional violence, including how to make explosive devices. For example, on February 15, 2021, he saved the below images, among others, which are instructions on how to "Make a Molotov Cocktail" and how to "Make an Improvised Explosive Device":



*Images 30, 31: Images Dykes saved to his phone on February 15, 2021.*

      iii.    *Dykes was Discharged from the Military in May 2023 for "Participating in Extremist Behavior."*

After Dykes's arrest for his Unite the Right Rally conduct (discussed below), Dykes was discharged from the United States Marine Corps in May 2023 under other than honorable conditions for participating in prohibited activities, namely, "participating in extremist behavior or about" November 8, 2020. *See* Ex. 19 (excerpted military records, to be filed under seal). In text messages around that time, Dykes sent a picture of his discharge letter, claiming he was discharged for "being incredibly political with my fellow marines" after President Biden won the 2020 election. However, Dykes falsely told Probation he "was asked to leave the military after not reporting for drill." PSR ¶ 92.

      iv.    *Dykes was Arrested on the Virginia Torch-Related Charges in 2023 and was then Transferred to FBI Custody on January 6-Related Charges.*

On March 17, 2023, Dykes was arrested on the Virginia torch-related charges.[5] At his detention hearing, where bail was denied, the prosecution supplied the court with evidence that Dykes had sent Telegram messages to the "Southern Sons Active Club"[6] group under the username "Nocturnal Wolf," where he told members, "I'm arrested in Virginia. Nuke my account." *See id.*

When he was arrested on the Virginia charges, Dykes also happened to be wearing the same tan, Adidas baseball hat that he wore on January 6, 2021. For this reason, the FBI sought to

---

[5]  *See, e.g.*, https://www.cnn.com/2023/04/21/us/charlottesville-rally-suspects-court/index.html (citing https://the-devils-advocates.ghost.io/burning-hate-bond-review/).

[6]  According to his attorneys, Dykes failed to disclose his association with "Southern Sons Active Club" during his interview with the USPO, on the grounds that he did not consider it a "gang." PSR ¶84.

arrest him on the January 6-related federal charges before he was released from the Virginia prison, where he was serving his five-year sentence (4 years and 6 months of which was suspended). He was then transferred to federal custody on the charges in this case.

As the above makes clear, Dykes's history and characteristics are concerning and further support the recommended sentence.

### C.       The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration to deter Dykes and those that would engage in similar conduct. Dykes's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.       The Need for the Sentence to Afford Adequate Deterrence.

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a sentence at the high end of the Guidelines range. First, although Dykes

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

has only one felony conviction resulting in a criminal history category of II, as shown above, he was not charged with his prior assaultive conduct at the Unite the Right Rally, which results in an understated criminal history score. In addition, Dykes showed consciousness of guilt when he stated in the debrief that he wore his neck gaiter all day on January 6 in order to protect his identity.

Furthermore, as also noted above, the contents of Dykes's cell phone, paired with public and FBI-obtained information about Dykes history and characteristics, suggest a continued willingness to use, advocate for, and celebrate ideologically-motivated violence.

While Dykes has accepted responsibility for his actions by pleading guilty, there is no indication that Dykes feels any remorse for his actions. In fact, as noted above, certain items recovered from his phone show that after January 6, he celebrated the riot as righteous. Finally, as discussed above, Dykes's troubling fixation with militarization, weapons, violence, and racism suggests he is at a higher risk of recidivism, especially carrying out ideological violence. This risk warrants a greater need for specific deterrence in this case.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Dykes's conduct is comparable to that of Robert Scott Palmer. *See United States v. Palmer*, 21-cr-328 (TSC). Palmer, like Dykes, assaulted multiple law enforcement officers on January 6. While in the in the Lower West Terrace area, Palmer threw wooden items at officers and sprayed a fire extinguisher at them. Unlike Dykes, Palmer had no criminal history. Palmer pleaded guilty

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

to one count of violating of 18 U.S.C. § 111(a) and (b), while Dykes has pleaded guilty to two counts of 111(a) with the dangerous weapons enhancement. The court sentenced Palmer to 63 months' imprisonment, at the low end of his Guidelines range.

The Court may also wish to compare Dykes's case to that of James Phillip Mault. *See United States v. Mault*, 21-cr-00657-BAH (BAH). Like Dykes, Mault's plans to go to D.C. were not made at the last minute; instead, he told friends going to D.C. to arm themselves with batons and pepper spray, among other things. On January 6, Mault and his friend and co-defendant, Cody Mattice, led the mob that penetrated the police line in the West Plaza. Later, at the Lower West Terrace Tunnel, Mault tried to use pepper spray against officers in the tunnel, and also passed his co-defendant a canister of pepper spray that he used to attack officers. Like Dykes, Mault was a former soldier in the United States Army. Unlike Dykes, he had no criminal history and had no affiliations with violent extremist groups. This Court sentenced Mault to 44 months' imprisonment, at the high end of the Guidelines range.

The Court may also wish to compare Dykes's case to that of Dillon Herrington. *See United States v. Herrington*, 23-cr-00199 (BAH). On January 6, Herrington advanced with the mob to the West Plaza of the Capitol where he encountered police officers and hurled a 4 x 4 piece of lumber at them, among other things. He also shouted violent threats toward officers, like, "Look me in the fucking eyes, motherfucker! I'm coming for you!" Like Dykes, Herrington was a former soldier in the United States Army. Although Herrington brought a large military-style knife and a small stun gun to the Capitol, he had no criminal history and had no affiliations with violent extremist groups. Herrington also pleaded guilty to only one Section 111(a) count with a dangerous weapon

enhancement. This Court sentenced Herrington to 37 months' imprisonment, at the low end of the Guidelines range.

Finally, the Court may wish to consider Dykes's case against that of Grady Douglas Owens. *See United States v. Owens,* 21-cr-00286-BAH. Owens was a twenty-year old student at Full Sail University on January 6. On the west lawn, officers began pushing rioters out of their way when those rioters were ignoring the officers' verbal commands to move. In response to one officer pushing a rioter out of his way, Owens violently attacked that officer by raising his skateboard above his head and bringing it down to strike the officer. Similar to Dykes's assault at the East Rotunda Doors, Owens' assault on that officer caused a ripple effect in which other rioters assaulted other police officers. Unlike Dykes, Owens had no criminal history and had no affiliations with violent extremist groups. Herrington also pleaded guilty to only one Section 111(a) count with a dangerous weapon enhancement. This Court sentenced Herrington to 37 months' imprisonment, at the low end of the Guidelines range.

A longer sentenced is warranted in Dykes's case as compared to Mault's, Herrington's and Owens's because of Dykes's criminal history, his demonstrated proclivity for ideological violence, and the fact that he pleaded guilty to two charges, both of which involve his use of a dangerous weapon.

Accordingly, a sentence of 63 months, at the high end of Dykes's Guidelines range, would not create an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose

restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar

covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Dykes to pay $2,000 in restitution pursuant to the plea agreement. This amount fairly reflects Dykes's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions for violations of Section 111(a) subject him to a statutory maximum fine of $250,000 for Count Three and $250,000 for Count Four. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the

defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e)., According to the PSR, the defendant is able to pay a fine. *See* PSR ¶ 103.

## IX.    CONCLUSION

For the reasons set forth above, the government requests that this Court sentence Dykes to 63 months of incarceration, at the mid-range of the applicable Sentencing Guidelines range; three years of supervised release; $2,000 in restitution; and a $200 mandatory special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov